# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

| | | |
|---|---|---|
| **ANDREA KATHLEEN DIXON,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.: 7:07-CV-604-RDP** |
| | } | |
| **CITY OF TUSCALOOSA; THOMAS** | } | |
| **E. BURROUGHS, also known as T.E.** | } | |
| **Burroughs,** | } | |
| | } | |
| **Defendants.** | } | |

## MEMORANDUM OPINION

This case is before the court on Defendant Thomas E. Burroughs' Motion for Summary Judgment (Doc. # 57) filed on July 31, 2008; Defendant City of Tuscaloosa's Motion for Summary Judgment (Doc. # 58) filed on July 31, 2008; and Plaintiff Andrea Kathleen Dixon's Motion to Strike (Doc. # 59) filed on August 12, 2008. The motions, which were filed under seal,[1] have been fully briefed and were under submission as of September 29, 2008. (*See* Docs. # 3, 24, 49; Margin Order of May 5, 2008; Margin Order of September 11, 2008; Margin Order of September 17, 2008).

For the reasons outlined below, the court finds that Defendants' motions are due to be granted as they relate to Plaintiff's federal claims because there are no disputed issues of material fact and Defendants have demonstrated that they are entitled to judgment as a matter of law. As to the remaining state law claims, the court declines to exercise supplemental jurisdiction under 28

---

[1] Upon motion of the Defendants, and with Plaintiff's consent, the court gave leave for the parties to file their dispositive motions, including supporting materials, under seal because they "necessarily make reference to certain youthful offender proceedings currently pending in state court. *See* ALA. CODE §15-19-1 *et seq*." (Doc. # 56).

U.S.C. § 1367(c)(3) and therefore remands those claims for further consideration by the state court. Plaintiff's motion to strike will be granted.[2]

## I.    Procedural History

On March 5, 2007, Plaintiff Andrea Kathleen Dixon ("Dixon" or "Plaintiff") brought suit in the Circuit Court of Tuscaloosa County, Alabama on behalf of herself and a putative class against Defendants City of Tuscaloosa, Alabama (the "City"), and Police Officer Thomas E. Burroughs, in his individual capacity, ("Officer Burroughs"), arising out of her September 6, 2006 arrest on the charge of "Minor in Possession of Alcohol," which is codified at Ala. Code § 28-3A-25(a)(19). (Doc. # 1-2). Plaintiff's initial complaint alleged both: (1) individual claims of false arrest and imprisonment (Count One) and assault and battery or, alternatively, excessive force (Count Two); and (2) class claims of money had and received (Count Three), unjust enrichment (Count Four), and declaratory, injunctive, and equitable relief (Count Five).  (Doc. # 1-2).

On April 4, 2007, Defendants jointly removed the case to this court on the sole basis of federal question jurisdiction under 28 U.S.C. §1331.[3]  (Doc. # 1).  Defendants identified only one

_____

[2] Plaintiff has moved to strike an order issued by the judge in Plaintiff's state court criminal proceeding on the grounds that it has no "res judicata or collateral estoppel effect" on this court's analysis of the summary judgment papers. (Doc. # 59).  The court has reviewed Plaintiff's motion and will assume, without deciding, for the purposes of summary judgment only, that it is due to be granted and that the evidence sought to be stricken is not properly before the court in its summary judgment analysis.  As the court is granting summary judgment in favor of the Defendants on the federal claims, it finds that, even without considering the evidence sought to be stricken, Plaintiff has not met her burden to show that there are material issues of fact with respect to the federal claims in this case.

[3] Indeed, federal question jurisdiction is the only possible ground for removal of Plaintiff's claims in this case.  Defendants could not have removed on the basis of diversity jurisdiction as they are both citizens of Alabama, the State in which this action was brought.  *See* 28 U.S.C. 1441(b) ("Any civil action of which the district courts have original jurisdiction founded on a claim or right arising under the Constitution, treaties or laws of the United States shall be removable without regard

"federal claim" in the complaint that established federal question jurisdiction: "Such actions by the City of Tuscaloosa are violative of Plaintiff's rights . . . to due process as provided for under the United States Constitution and the Alabama Constitution of 1901." (Doc. # 1, at 2 (*citing* Doc. # 1-2, at ¶ 21)).   As to Plaintiff's pendent state law claims, Defendants sought the court's supplemental jurisdiction under 28 U.S.C. § 1367.  (Doc. # 1).

After the case was reassigned to the undersigned on January 14, 2008 (Doc. # 41), the court held a status conference (Doc. # 43), as a result of which Plaintiff was ordered to file an amended complaint (Doc. # 46).  Plaintiff's Second Amended Complaint, which is currently before the court, alleges four individual claims: (1) negligence against Officer Burroughs and negligence via vicarious liability against the City (Count One); (2) negligent training of Officer Burroughs against the City (Count Two); (3) false arrest and imprisonment against Officer Burroughs and the City (Count Three); and (4) assault and battery or, alternatively, excessive force against Officer Burroughs and the City (Count Four).  (Doc. # 47, at 11-13).  Plaintiff's complaint also alleges the following claims against the City alone on behalf of a putative class: (1) money had and received (Count Five); (2) unjust enrichment (Count Six); and (3) declaratory, injunctive, and equitable relief (Count Seven). (Doc. # 47, at 14-16).

To say that Plaintiff's complaint – even in its third genesis – is not artfully pled is an understatement.  Although her complaint does not lack for reference to various state laws, both codified and common (*see, e.g.*, Doc. # 47, at ¶¶ 48, 49, 51, 55), *it utterly fails* to invoke 28 U.S.C. § 1983, the Fourth Amendment, or any other federal vehicle as a basis for the counts alleging "false

---

to the citizenship or residence of the parties. Any other such action shall be removable only if none of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought.").

arrest and imprisonment" (Count Three) and "assault and battery/excessive force" (Count Four), and both of those sets of claims could lie in either state or federal law, or both.[4]

Despite that pleading ambiguity, however, the parties have proceeded from the outset of the case under the assumption that Plaintiff has asserted, through the vehicle of § 1983, federal Fourth Amendment claims against Officer Burroughs and the City based upon (1) her alleged arrest without probable cause, and (2) and the use of excessive force to effectuate that arrest.  (*See, e.g.,* Docs. # 5, 6, 7, 8, 12, 13, 19, 35, 38).  Indeed, the first motion filed by Defendants at the outset of this case sought dismissal of Plaintiff's initial complaint on the basis of qualified immunity for the Fourth Amendment claims against Officer Burroughs. (Docs. # 5, 6, 12).  After a hearing on that motion, the judge of this court previously assigned to the case "gave Plaintiff an opportunity to file an amendment to her Complaint in order to attempt to allege sufficient facts to deny Officer [] Burroughs qualified immunity with regard to the two claims against him: (1) [false] arrest; and (2) that he used excessive force in connection with the arrest."  (Doc. # 35, at 1).

This is not a case where Plaintiff has alleged sufficient form without sufficient substance – in fact, it is just the reverse.  Plaintiff's detailed allegations in her second amended complaint are certainly sufficient to satisfy even a heightened pleading standard under § 1983.  The ambiguity in Plaintiff's complaint lies in her lack of citation to statutory authority for her claims – claims which could arguably have a basis in either state or federal law.

Nevertheless, the court finds that given the particularity of Plaintiff's allegations and the invocation of Fourth Amendment "buzz words" like "excessive force" and "probable cause," Plaintiff's allegations "are sufficient to toll the constitutional bell" even in the absence of direct

---

[4] Counts One and Two, which allege negligence-based claims, sound only in state law.

citation to the applicable statutes or constitutional provisions.  *Reeves v. City of Jackson*, 532 F.2d 491, 494 (5th Cir. 1976); *see also Graham v. Connor*, 490 U.S. 386, 394 (1989) ("All claims that law enforcement officers have used excessive force – deadly or not – in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard.").[5]  With that foundation, the court has endeavored to determine whether Plaintiff's federal claims under the Fourth Amendment, which were the only basis for removal of this case, can withstand Defendants' arguments on summary judgment.   As outlined in detail below, the court is persuaded that they cannot.  Because only state law claims remain after the dust settles, the court has chosen to exercise its discretion to remand those claims for consideration by the state court.

## I.  Legal Standards for Evaluating a Summary Judgment Motion

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The party asking

---

[5]  The court is keenly aware that the parties cannot create federal jurisdiction by agreement. But that is not what has occurred here. Plaintiff is the master of her complaint.  Thus, this situation is quite different from one in which a plaintiff's complaint cites to no federal law and, when defendants suggest that her claims are federal in nature, she explicitly disclaims such reliance.  To the contrary, in this case, Plaintiff has agreed with Defendants from day one that her complaint asserts Fourth Amendment § 1983 claims to which (as to Officer Burroughs) the defense of qualified immunity may apply. *Cf. City of Winston-Salem v. Chauffeurs, Teamsters & Helpers Local Union No., 391*, 470 F.Supp. 442, 448 (D.N.C., 1979)("Defendants' last suggestion is that plaintiff's complaint really states claims on behalf of its employees under 42 U.S.C. § 1983 . . . . The problem with defendants' position is that the complaint nowhere supports itself by citation to federal law, and plaintiff explicitly disclaims such reliance. As stated previously, plaintiff is the master of its complaint, and it is of no consequence that plaintiff's state cause of action may be meritless.").

for summary judgment always bears the initial responsibility of informing the court of the basis for

its motion and identifying those portions of the pleadings or filings which it believes demonstrate

the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party

has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and by her

own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate

specific facts showing that there is a genuine issue for trial. *See id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See*

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts

and all justifiable inferences are resolved in favor of the non-movant. *See Fitzpatrick v. City of*

*Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a

reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the

evidence is merely colorable, or is not significantly probative, summary judgment may be granted.

*See id.* 249.

## II.    **Relevant Undisputed Facts**[6]

Alabama law criminalizes and prohibits the possession of alcoholic beverages, such as liquor,

by minors. *See* ALA. CODE §§ 28-3A-25(a)(19); 28-1-5.[7] The claims in this case arise from Officer

---

[6] If facts are in dispute, they are stated in the manner most favorable to Plaintiff, *Fitzpatrick*, 2 F.3d at 1115, although the court has noted when facts are in dispute.

[7] Ala. Code § 28-3A-25 (a)(19) provides, in pertinent part: "It shall be unlawful . . . [f]or any person under the legal drinking age, as defined in Section 28-1-5, to attempt to purchase, consume, possess, or to transport any alcoholic beverages within the state." ALA. CODE § 28-3A-25 (a) (19)(1975). Ala. Code § 28-1-5 provides, in pertinent part: "Notwithstanding the provisions of Section 26-1-1, it shall be unlawful for a person less than 21 years of age to purchase, consume, possess, or to transport any alcohol, liquor or malt or brewed beverages within the State of Alabama." ALA. CODE § 28-1-5 (1975).

Burroughs' arrest and detainment of Plaintiff during the late hours of September 6, 2006, and early hours of September 7, 2006, on charges of violating the "Minor in Possession of Alcohol" prohibition found in Ala. Code § 28-3A-25(a)(19) (the "MIP law").

On the evening of September 6, 2006, Officer Burroughs was serving the City as a "peace officer"[8] by entering bars in Tuscaloosa, Alabama, the site of the University of Alabama, to enforce the MIP law, among other alcohol-related laws. (Burroughs Aff.). As part of that duty, Officer Burroughs and two other officers, dressed in full uniform, patrolled the 4th and 23rd lounge (the "Bar") at approximately 11:30 p.m. that night. (Burroughs Aff.). Through both training and experience, Officer Burroughs was familiar with the techniques used by minors to evade the MIP law, and he was familiar with the types of circumstantial evidence which provide probable cause to believe that a person has violated that law. (Burroughs Aff.). Officer Burroughs noted that one tactic often used by minors to consume alcohol in a public establishment is to "sip" from an alcoholic beverage purchased by an adult who is positioned to be a "lookout" for any police officers entering the establishment (the "lookout position"). (Burroughs Aff.).

---

[8] The term "peace officer" is particularly relevant to issues of state law discretionary function immunity. *See, e.g.,* ALA. CODE § 6-5-338(a) (1975) ("Every peace officer . . . who is employed or appointed pursuant to the Constitution or statutes of this state, whether appointed or employed as such peace officer by the state or a county or municipality thereof, . . . and whose duties prescribed by law, or by the lawful terms of their employment or appointment, include the enforcement of, or the investigation and reporting of violations of, the criminal laws of this state, and who is empowered by the laws of this state to execute warrants, to arrest and to take into custody persons who violate, or who are lawfully charged by warrant, indictment, or other lawful process, with violations of, the criminal laws of this state, shall at all times be deemed to be officers of this state, *and as such shall have immunity from tort liability arising out of his or her conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties.*")(emphasis added).

During the period of time relevant to this case, the Bar served alcoholic beverages, and all of the Bourbon liquors that it sold were at least 70 proof or 35% by volume. (Gnemi Depo. at 29-32). As required by State law, the Bar posted a sign stating that all alcoholic beverages served contained at least one and a quarter ounces of alcohol, and the Bar uniformly complied with this representation. (Gnemi Depo. at 25-32; McGee Statement at 25-27). Like other establishments in Tuscaloosa that serve alcoholic beverages, the Bar was occasionally the venue of violent conflicts between its patrons, as well as violations of the MIP law. (McGee Statement at 6-7, 15-19).

Although the Bar allowed minors to enter the premises, it had a policy of marking the backs of all minors' hands with a large "X" to exhibit their underage status to bartenders and others. (McGee Statement at 30-33, 44). The Bar sold alcoholic beverages, but it also provided soft drinks such as Diet Cokes to its patrons at no charge. (Ball Depo. at 10-11; Gnemi Depo. at 10-11). In order to distinguish between alcoholic and non-alcoholic beverages, the Bar served all alcoholic beverages in clear plastic cups, which were smaller than the cups used to serve complimentary soft drinks. (McGee Statement at 24-29; Gnemi Depo. at 32-33). Despite those efforts to discourage underage drinking, adult patrons of the Bar often improperly permitted minors to consume and/or possess alcoholic beverages they had purchased, which resulted in frequent infractions of the MIP law. (McGee Statement at 18-19, 31-33; Ball Depo. at 8-14).

Plaintiff, a Tennessee resident who began attending the University of Alabama in Tuscaloosa as a student in Fall 2005, attended a band party at the Bar on September 6, 2006. (Dixon Depo. at 70, 75). At that time, she was nineteen years old. (Dixon Depo. at 9-10). According to Emily Wilson, one of Plaintiff's sorority sisters and one of her companions that evening, Plaintiff came to her room at the sorority house before they left for the Bar and "sipped" on a water bottle containing

a liquid that looked and smelled like Bourbon. (Wilson Depo. at 40-44). At approximately 10:30 p.m., Plaintiff, Wilson, and another sorority sister Stephanie Parker, left their sorority house for the Bar. (Dixon Depo. at 56-59). Upon their arrival, a Bar employee clearly marked the backs of Plaintiff's hands with a large "X" to designate her as a minor. (Dixon Depo. at 64-66, 84). After entering the Bar, Plaintiff met and talked with an adult patron, Andy Yerbey, who had already consumed alcoholic beverages. (Dixon Depo. at 67-68, 75-79; McGee Statement at 54-57; Yerbey Depo. at 42-44).

Plaintiff and Yerbey were sitting near the bar area when Officer Burroughs and other police officers entered the Bar between 11:30 p.m. and midnight. (Moras Aff.). Yerbey was facing the door, and Plaintiff was sitting with her back to the door. (Dixon Depo. at 86-87). According to Chris Moras, one of the doormen employed by the Bar, Plaintiff reacted with a "deer in the headlights" look when the police arrived. (Moras Aff.). However, according to Plaintiff, no one told her that the police had arrived at the bar. (Dixon Depo. at 87).

The cup Plaintiff was holding at the time Officer Burroughs entered the bar was a cup used exclusively by the Bar for serving alcoholic beverages. (Moras Aff.; Burroughs Aff.). Plaintiff does not dispute that the cup she was holding at the time the police arrived was identical to Yerbey's transparent plastic cup. (Dixon Depo. at 80, 84-85).[9] She also admits that she had consumed some

---

[9] There appears to be some dispute about whether the drink Plaintiff was holding when Officer Burroughs entered the Bar was actually Yerbey's drink. Yerbey and Plaintiff both aver that she was not holding his drink (Yerbey Depo. at 18; Dixon Depo. at 109), while other witnesses testified that Yerbey either told Burroughs that Plaintiff was holding his drink (Burroughs Aff.; Moras Aff.), or asked Burroughs whether it was illegal for Plaintiff to hold his drink (Atkins Depo. at 106-09). This dispute is immaterial, however, because Plaintiff does not dispute that she was holding a cup that was identical to the one that Yerbey was holding, which was undisputedly the type of cup reserved for serving alcoholic beverages. Therefore, it is not material whether or not Plaintiff was actually holding Yerbey's cup.

of the beverage in her cup prior to Officer Burroughs' arrival at the Bar.  (Dixon Depo. at 83).

Plaintiff claims that her beverage was a Diet Coke that she had "purchased" (Dixon Depo. at 68, 71-72, 80, 267), although it is undisputed that the Bar does not "sell" Diet Cokes to patrons but rather provides them at no charge in cups larger than those used to serve alcoholic beverages (Ball Depo. at 10-11; Gnemi Depo. at 10-11, 33-34; McGee Statement at 24-29, 92-94).

According to Officer Burroughs, when he entered the Bar, he noticed Plaintiff and Yerbey sitting in what appeared to be the "lookout position," noticed Plaintiff's "deer in the headlights" reaction when she made eye contact with him, surmised her to be a minor, saw a beverage in her hand in the type of cup reserved for alcoholic beverages, and ascertained that the liquid in her cup was a mixture of Bourbon whiskey and something else.  (Burroughs Aff.).  According to Plaintiff, Officer Burroughs never touched or smelled the cup she was holding.  (Dixon Depo. at 90-91).[10] Based upon his training and experience, Burroughs concluded that Plaintiff had violated the MIP law and that he had probable cause to charge her with such a violation.  (Burroughs Aff.).   Plaintiff agrees that Officer Burroughs "seemed to think" that she had violated the MIP law.  (Dixon Depo. at 93, 105).

Despite his assessment that she had broken the law, Officer Burroughs initially decided to issue Plaintiff a citation rather than to arrest her.  (Burroughs Aff.).  Because the bar was crowded and noisy, Officer Burroughs grabbed Plaintiff's arm and ushered her out of the Bar onto the sidewalk outside.  (Burroughs Aff.; McGee Statement at 63-64, 68; Dixon Depo. at 86).  Plaintiff admits that she did not leave the Bar voluntarily.  (Dixon Depo. at 94-97).

---

[10] Defendants dispute Plaintiff's recollection.  Both Officer Burroughs and Doorman Moras testified that Officer Burroughs took possession of the cup and smelled its contents.  (Burroughs Aff.; Moras Aff.).

Outside, Officer Burroughs asked Plaintiff for her identification, which she gave him, and he began writing her MIP citation. (Dixon Depo. at 97-99; Burroughs Aff.). While outside, Plaintiff repeatedly told Officer Burroughs that she had not possessed any alcohol and continued to deny her guilt even when Officer Burroughs did not respond. (Dixon Depo. at 92, 93, 101-02). According to Officer Burroughs, Doorman Moras, and Tyler McGee, another Bar employee who witnessed the incident, Plaintiff threw a "temper tantrum," continually interrupting Officer Burroughs, denying that she had consumed alcohol, and belligerently denying that Officer Burroughs had the right to charge her with a violation. (Burroughs Aff.; Moras Aff.; McGee Statement at 78-79).

Then, Yerbey came outside and insisted to Officer Burroughs that Plaintiff had not been holding an alcoholic drink. (Dixon Depo. at 97-99). According to witnesses, Yerbey, who is much taller than Officer Burroughs standing approximately 6'4" tall, was very loud and "got between" Officer Burroughs and Plaintiff to angrily argue with him. (Moras Aff.; Burroughs Aff.; McGee Statement at 75). Earlier that night, Yerbey had consumed a few beers and a "Jager Bomb," which contains liquor and a highly caffeinated energy drink. (Yerbey Depo. at 9-16, 108-11). Officer Burroughs asked Yerbey to stop yelling, but Yerbey continued to argue with him. (Dixon Depo. at 236).[11]   Officer Burroughs became concerned about the crowd that was gathering around them as Yerbey continued to yell and Plaintiff failed to heed his warnings, and he wanted to ward off the

---

[11] According to Yerbey, he became quiet when Officer Burroughs asked him to step away. (Yerbey Depo. at 28). Plaintiff, however, testified that Yerbey continued to argue with Burroughs even after he was asked to stop.  (Dixon Depo. at 236).

possibility of violence from inebriated onlookers.  (Burroughs Aff.; Dixon Depo. at 108-10, 115-16; Yerbey Depo. at 95-96).[12]

In order to remove Plaintiff from the situation, Officer Burroughs decided to effect a full custodial arrest of Plaintiff and take her to the Tuscaloosa Police Department for further processing. (Burroughs Aff.).   It is standard operating procedure for all arrestees to be handcuffed while being transported in a police vehicle.  (Burroughs Aff.).  Therefore, Burroughs began handcuffing Plaintiff, although he succeeded in securing only one of her wrists in a cuff.  (Burroughs Aff.; Moras Aff.). Plaintiff "flinched" and prevented him from securing her other wrist.  (Dixon Depo. at 99; Burroughs Aff.; Moras Aff.; McGee Statement at 79-83).  Other witnesses observed Plaintiff resisting Officer Burroughs' attempts to handcuff her.  (Moras Aff.; McGee Statement at 79-83).  At that point, Burroughs spun her toward the brick wall behind her and handcuffed her other wrist.  (Dixon Depo. at 99).

Plaintiff was then transported, handcuffed, to the Police Department.  (Dixon Depo. at 145-48).  While en route, Officer Burroughs told Plaintiff that she did not need an alcohol test because he could tell that she smelled of alcohol, which she did not deny.  (Dixon Depo. at 146-48).  Plaintiff cried during the ride, although she did not voice any complaints of pain from the handcuffs, nor did she request that they be loosened.  (Dixon Depo. at 145).

After arriving at the Police Department, Officer Burroughs took Plaintiff to the processing center, removed her handcuffs, and sat her next to a computer console.  (Burroughs Aff.; Dixon Depo. at 148, 150, 152-55).   They were the only two people in the processing center at that time.

---

[12] Yerbey opined that, in his estimation, the situation outside was not dangerous. (Yerbey Depo. at 122, 124).

(Burroughs Aff.).  Burroughs began to enter Plaintiff's booking data into the computer, but when he told her he was charging her with resisting arrest in addition to the MIP violation, Plaintiff became loud and disruptive.  (Burroughs Aff.; Dixon Depo. at 156-57).   When Plaintiff disregarded warnings to calm down, and given that he was the only officer in the building, Burroughs decided to place her in a holding cell to allow him to complete the booking process.  (Burroughs Aff.; Dixon Depo. at 149, 158).

Plaintiff complied with Officer Burroughs' instruction to get up out of the chair (Dixon Depo. at 158), and he pushed her by the shoulders to a holding cell (Dixon Depo. at 149).  When they entered the cell, Officer Burroughs forcefully guided her down onto a bench and then screamed "harassment," accusing Plaintiff of harassing him.  (Dixon Depo. at 149, 171-72).  According to Officer Burroughs, Plaintiff, who was still un-handcuffed, had increased her level of resistance as they entered the cell, which forced him to push her through the threshold of the cell. (Burroughs Aff.).  When Plaintiff hit the bench, she "hit about half of it and fell to the floor."  (Dixon Depo. at 164).  While she was on the floor, Officer Burroughs attempted to regain control by applying pepper spray to her face.  (Dixon Depo. at 163-64, 172-73; Burroughs Aff.).[13] When Sergeant Melvin Green entered the processing center shortly afterwards and asked Plaintiff if she had attacked Officer

---

[13] According to Officer Burroughs, Plaintiff immediately sprung up from the floor swinging at him.  (Burroughs Aff.).  Burroughs' recollection is corroborated by Dr. Scott Atkins' notes of Plaintiff's recitation of the incident shortly after it happened:  that she "instinctively raised her arm and that it made contact with the cop." (Atkins Depo. at 124-25). At her deposition, however, Plaintiff denied that she made any motion in Officer Burroughs' direction (Dixon Depo. at 169), and the court has construed the facts in the light most favorable to Plaintiff.  Similarly, although Officer Burroughs stated that Plaintiff collided with him and knocked his glasses off, wrestling them both to the floor (Burroughs Aff.), Plaintiff denies having knocked Officer Burroughs' glasses off (Dixon Depo. at 169).

Burroughs, Plaintiff's only response was, "I was sleepy."  (Green Depo. at 8, 13-17, 19, 25, 36-40, 44-45).

Because no female officers were present at the processing facility after Plaintiff received the pepper spray, she could not be properly decontaminated there.  (Burroughs Aff.; Green Depo. at 17-24).  Therefore, at Sergeant Green's direction, Officer Burroughs transported Plaintiff to the Tuscaloosa County Metro Jail where such facilities were available under the supervision of the Tuscaloosa County Sheriff's Department.  (Burroughs Aff.; Green Depo. at 17-24).[14]

As a standard practice, officers of the Tuscaloosa Police Department do not take into permanent possession (nor subject to any pharmacological or other chemical testing) substances alleged to be "alcoholic beverages," in connection with the issuance of citations and/or arrests for violation of Ala Code. § 28-3A-25(19).  (Stipulations in Lieu of Rule 30(b)(6) Deposition at 3).  Thus, any substance alleged to be an "alcoholic beverage" in connection with Plaintiff's arrest was not taken by any member of the Police Department from the Bar on the night of September 6, 2006, nor was it subjected to any pharmacological or other chemical testing by or on behalf of the City.  (Stipulations in Lieu of Rule 30(b)(6) Deposition at 4).

---

[14] Although Plaintiff's complaint and brief in opposition to summary judgment contain additional facts related to the treatment Plaintiff received at the Metro Jail, it is undisputed that: (1) Officer Burroughs did not remain at the jail after transferring Plaintiff's custody; and (2) the personnel at the jail were not employees of the City or under the direction of the City.  (Burroughs Aff.). Plaintiff has not brought suit against the Sheriff's Department or anyone employed by the Metro Jail, nor does she bring claims based upon the treatment she received after her custody was transferred to that facility.  (Doc. # 47).  Accordingly, while those facts may complete the story of Plaintiff's detainment on the night in question, they are not material to the court's consideration of the pending dispositive motions, and the court will not discuss them herein.

**III.**    **Substantive Discussion of the Claims Against Officer Burroughs**

As noted earlier, the court's analysis centers on Plaintiff's two federal claims, asserted via § 1983, brought against the Defendants in this case: (1) lack of probable cause/false arrest (Count Three); and (2) excessive force (Count Four).   The Fourth Amendment guards against both unlawful arrest and the use of excessive force during arrest. *See Durruthy v. Pastor*, 351 F.3d 1080, 1093 (11th Cir. 2003).   Officer Burroughs has raised the affirmative defense of qualified immunity as to the claims against him, which is a defense designed to greatly limit litigation against police officers (and other state actors) in their individual capacities.   Accordingly, the court will first outline the parameters of the defense before delving into a substantive analysis of each federal claim against Officer Burroughs.

**A.**    **The Defense of Qualified Immunity**

The purpose of qualified immunity is "to ensure that before they are subjected to suit, [police] officers are on notice [that] their conduct is unlawful." *Saucier v. Katz*, 533 U.S. 194, 206 (2001). Therefore, "the salient question . . . is whether the state of the law [at the time of the events in question] gave [the officer] fair warning that [his] alleged treatment of [the plaintiff] was unconstitutional." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1278 (11th Cir. 2004) (*quoting Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).   Indeed, the defense is so broad that only those officers who are "plainly incompetent and those who knowingly violate the law" are required to defend against individual liability claims.  *Malley v. Briggs*, 475 U.S. 335, 341 (1986); *GJR Investments, Inc. v. County of Escambia*, 132 F.3d 1359, 1366 (11th Cir. 1998).   The Eleventh Circuit has cautioned that, "[b]ecause qualified immunity shields government actors in all but

exceptional cases, courts should think long and hard before stripping defendants of immunity." *Lassiter v. Alabama A & M University, Bd. of Trustees*, 28 F.3d 1146, 1149 (11th Cir. 1994).

To be entitled to qualified immunity, a defendant must establish "that he [] acted within the scope of discretionary authority when the allegedly wrongful acts occurred." *Sims v. Metropolitan Dade County*, 972 F.2d 1230, 1236 (11th Cir. 1992).[15]  Once this is proven – and no one disputes that Officer Burroughs acted within his discretionary authority in this case – the burden shifts to Plaintiff to show that qualified immunity is not applicable.  *Crosby v. Monroe County*, 394 F.3d 1328, 1332 (11th Cir. 2004).

"In order to demonstrate that the official is not entitled to qualified immunity, the plaintiff must show two things: (1) that the defendant has committed a constitutional violation and (2) that the constitutional right the defendant violated was 'clearly established' at the time he did it." *Crosby*, 394 F.3d at 1332 (citation omitted).  "The threshold inquiry is whether plaintiff's assertions, if true, establish a constitutional violation." *Hope*, 536 U.S. at 736.  If the court determines that the plaintiff has not alleged a deprivation of a constitutional right, then the inquiry ends. *County of Sacramento v. Lewis*, 523 U.S. 833, 841 n. 5 (1998).

However, if the court determines that the plaintiff has, in fact, alleged a deprivation of a constitutional right, then further inquiry is needed as to "whether that right allegedly implicated was clearly established at the time of the events in question." *Lewis*, 523 U.S. at 841 n. 5. "Clearly

---

[15] The term 'discretionary authority' includes all acts of a governmental official that are (1) undertaken pursuant to the performance of official duties, and (2) within the scope of the official's authority. *Jordan v. Doe*, 38 F.3d 1559, 1566 (11th Cir. 1994).  It is undisputed that, during the events in question, Burroughs was acting in his capacity as a police officer. Therefore, his acts were within the scope of his discretionary authority, and Burroughs has established this penultimate showing.

established" rights must be "developed [] in a concrete factual context so as to make it obvious to a reasonable government actor that his actions violate federal law." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).[16]  "While officials must have fair warning that their acts are unconstitutional, there need not be a case 'on all fours,' with materially identical facts, before we will allow suits against them. A principle of constitutional law can be 'clearly established' even if there are 'notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct at issue violated constitutional rights.'" *Holloman*, 370 F.3d at 1277 (*quoting United States v. Lanier*, 520 U.S. 259, 269 (1977); and *Hope*, 536 U.S. at 741).[17]  Only Supreme Court, Eleventh Circuit, and Alabama Supreme Court cases can "clearly establish" the law in this Circuit.  *Thomas v. Roberts*, 323 F.3d 950, 955 (11th Cir. 2003).

---

[16] There is a temporal requirement related to this inquiry.  A plaintiff must show that a reasonable public officer would not have believed his actions to be lawful in light of law that was clearly established *at the time* of the purported violation.  *Anderson*, 483 U.S. at 641; *Johnson v. Clifton*, 74 F.3d 1087, 1091 (11th Cir. 1996).

[17] As the Eleventh Circuit has explained:

The Supreme Court, in *Hope*, cautions against a "rigid gloss on the qualified immunity standard" that would require materially similar, preexisting cases in all circumstances when the qualified immunity defense is to be overcome. *Hope*, 122 S.Ct. at 2512. Such a "rigid gloss" would be in variance with the law of the Supreme Court and the law of this Circuit. We have denied qualified immunity in the absence of precedents with similar facts. We have said, in the context of excessive force cases, that an official's conduct could run so afoul of constitutional protections that fair warning was present even when particularized caselaw was absent: "the official's conduct was so far beyond the hazy border between excessive and acceptable force that [the official] had to know he was violating the Constitution even without caselaw on point." *Priester*, 208 F.3d at 926 (internal quotation marks omitted and second alteration in original).

*Willingham v. Loughnan*, 321 F.3d 1299, 1303 (11th Cir. 2003).

With that backdrop of applicable standards, the court now turns its attention to the question of whether Officer Burroughs is due the protection of qualified immunity as to the two claims against him.

**B.      The Claim of False Arrest/Imprisonment for Lack of Probable Cause**

Plaintiff's claim for false arrest and imprisonment is based upon her allegation that Officer Burroughs lacked probable cause to believe that she was in violation of the MIP law.  Specifically, she alleges that Officer Burroughs:

> knew or should have know[n]: (a) That there was no evidence that plaintiff was in possession of an alcoholic beverage within the meaning of [the MIP law]; [and] (b) That the defendants had a policy, practice and procedure of not taking into possession for . . . testing the substance(s) which constituted the "alcoholic beverage" . . . and, as a result, no justification of the prosecution of the purported charge.

(Doc. # 47, at ¶ 48 (Count Three "False Arrest and Imprisonment")).

"Plainly, an arrest without probable cause violates the right to be free from an unreasonable search under the Fourth Amendment." *Durruthy*, 351 F.3d at 1088. By the same token, the existence of probable cause at the time of arrest constitutes an absolute bar to a § 1983 action for false arrest. *Marx v. Gumbinner*, 905 F.2d 1503, 1505-06 (11th Cir. 1990).  Probable cause exists if an arrest is "objectively reasonable based on the totality of the circumstances."  *Wood v. Kessler*, 323 F.3d 872 (11th Cir. 2003)(internal quotations omitted).   "This standard is met when the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense."  *Wood*, 323 F.3d at 878 (internal quotations omitted).

18

Notably, although probable cause requires more than suspicion, it "does not require convincing proof, *and need not reach the [same] standard of conclusiveness and probability as the facts necessary to support a conviction.*" *Wood*, 323 F.3d at 878 (internal quotations omitted)(emphasis added).  Therefore, an officer is not required to have actual probable cause, but only "arguable probable cause." *Wood*, 323 F. 3d at 878 (internal quotations omitted).  "Even law enforcement officials who reasonably but mistakenly conclude that probable cause is present are entitled to immunity." *Wood*, 323 F.3d at 878 (internal quotations omitted).

> **1.     Applicable Law Establishing Probable Cause for Arrest Based Upon Illegal Alcohol Possession**

In this case, Plaintiff has not cited to any law – nor has the court independently discovered any law – establishing that, under the circumstances present in this case, Officer Burroughs did not have arguable probable cause to believe that Plaintiff was a minor in possession of alcohol in violation of the MIP law.  Plaintiff has neither disputed nor argued that Officer Burroughs lacked probable cause to believe she was a minor.  Nor has she argued that Officer Burroughs lacked probable cause to believe that she was in possession of *a* beverage in an unlabeled container.  Thus, Plaintiff's principal contention appears to be that Officer Burroughs lacked probable cause because he had no objective confirmation, in the form of pharmacological testing or chemical evaluation or other proof, that Plaintiff's beverage was alcoholic in nature.

Even though an Alabama statute made Plaintiff's actions illegal (allegedly), neither the parties nor the court have identified any Alabama cases directly on point to the relevant probable cause issue; *i.e.,* cases that establish what level of sensory perception is necessary for an officer to have arguable probable cause to believe that a beverage is alcoholic, particularly when the beverage

19

is not in a labeled container.  Although detection of a beverage as "alcoholic" via the sense of smell is sufficient, no case *requires* an officer to smell the suspect beverage before making an arrest. *Wilson v. State*, 113 So. 2d 359, 359-60 (Ala. App. 1959)(finding evidence that defendant had been driving automobile containing 21 gallons of liquid, and that officer, who knew what corn whiskey was, opened some jugs in the automobile and smelled contents which in officer's opinion was whiskey, was sufficient proof of illegality of liquid).

Despite the dearth of Alabama law on the issue, United States Supreme Court case law makes clear that probable cause to arrest for illegal possession of alcohol or a controlled substance exists when the trained eye of an officer identifies circumstances that are distinctively and reasonably suspicious, even if the officer has no objective confirmation of his suspicions.  *See Texas v. Brown*, 460 U.S. 730, 742 (1983)(finding probable cause to arrest for possession of narcotics based upon testimony that narcotics were commonly transported in balloons tied in the manner of the one possessed by a suspect, and finding it "all but irrelevant" that the arresting officer "could not see through the opaque fabric of the balloon" because "the distinctive character of the balloon itself spoke volumes as to its contents–particularly to the trained eye of the officer.").  The court has also identified several prohibition-era Supreme Court opinions that are instructive as to the level of "sensory" perception required for an officer to have probable cause to arrest for possession of an alcoholic beverage.  *See, e.g., Park v. United States*, 294 F. 776, 783-84 (1924)("[I]f an officer, at the time of the seizure, has ascertained facts, through the exercise of his senses of sight, smell, *etc.*, and from other sources of information, that would justify a reasonably prudent man in believing that the crime of transporting liquor in a vehicle contrary to law was being committed in his presence, a seizure would be authorized, and that the seizure in this case would have been authorized had it

been made by the federal officer. By this we do not mean that a federal officer, acting under this statute, can make an arrest and seizure on mere suspicion, but that he must have ascertained at the time facts that would justify a prudent man in believing that a crime was being committed in his presence."); *Garske v. U.S.*, 1 F.2d 620, 624 (1924)("It is not necessary that the officers actually see the liquor, the subject of the apprehension . . . [because] 'a discovery may be said to have been made by the federal officers when the evidence of their senses induces them to believe, upon reasonable grounds for belief, that an offense is being committed, and it is not necessary, if a sincere belief exists, and this belief is based upon reasonable grounds, that the officer actually see, before apprehension is made, the liquor the subject of the apprehension.'").

Based upon that body of case law, Officer Burroughs did not need objective or scientific confirmation of the contents in Plaintiff's cup to have probable cause to arrest her for possession of an alcoholic beverage, but his senses must have led him beyond mere suspicion to a reasonable and prudent belief that the contents of Plaintiff's cup were, in fact, alcoholic.

## 2.  Facts Related to the Existence of Arguable Probable Cause

According to Officer Burroughs, who entered the Bar on the evening in question because it typically attracted a high number of MIP violators, he had probable cause to suspect Plaintiff was in violation of the MIP law because, when he entered the Bar close to midnight, he noticed Plaintiff and Yerbey sitting in what appeared to be the "lookout position," saw Yerbey talk to Plaintiff when he walked in, noticed Plaintiff's "deer in the headlights" reaction when she made eye contact with him, surmised her to be a minor, saw a dark-colored beverage in her hand in the type of cup reserved for alcoholic beverages, and ascertained that the liquid in her cup was a mixture of Bourbon whiskey and something else.  (Burroughs Aff.).  Officer Burroughs also stated that based upon his training

21

and experience, it would be unlikely for a college-age person to be sitting in a bar close to midnight drinking only a soft drink. (Burroughs Aff.). Thus, Burroughs concluded that Plaintiff was in violation of the MIP law and that he had probable cause to charge her with such a violation. (Burroughs Aff.). Plaintiff agrees that Officer Burroughs "seemed to think" that she had violated this law. (Dixon Depo. at 93, 105).

The undisputed evidence supports Officer Burroughs' assessment of the situation. It is undisputed that when Officer Burroughs entered the Bar, Plaintiff and Yerbey were sitting in the "lookout" configuration with minor Plaintiff's back to the door and adult Yerbey facing the door. (Dixon Depo. at 86-87). Therefore, regardless of whether Yerbey was *actually* acting as a "lookout" (and to be clear, Plaintiff disputes that he was), Officer Burroughs could have reasonably *surmised* that was the case.

Plaintiff admits that she and Yerbey conversed when Officer Burroughs came in. (Dixon Depo. at 68, 86). Even though Plaintiff disputes that she was forewarned that the police had arrived (Dixon Depo. at 87), it is undisputed that Officer Burroughs saw her look in his direction when he entered the Bar and that others in the Bar saw the same "deer in the headlights" look on her face that Officer Burroughs witnessed. (Moras Aff.; Burroughs Aff.).

It is further undisputed that Plaintiff, who was nineteen years old (Dixon Depo. at 9-10), had her hands clearly marked by a Bar employee with a large "X" to designate her as a minor (Dixon Depo. at 64-66, 84). And Plaintiff does not dispute that the cup she was holding at the time the police arrived was identical to Yerbey's transparent plastic cup (Dixon Depo. at 80, 84-85), which was undisputedly the type of cup used *exclusively* by the Bar for alcoholic beverages (Moras Aff.;

Burroughs Aff.).  Plaintiff also admits that she had consumed some of the beverage in her cup prior to Officer Burroughs' arrival at the Bar.  (Dixon Depo. at 83).

Plaintiff's conduct after Officer Burroughs removed her from the Bar to issue her a citation, but before he arrested her, provides further support for his suspicion that she had possessed alcohol. Plaintiff repeatedly denied her guilt to Officer Burroughs (Dixon Depo. at 92-93, 101-02), which witnesses described as a "temper tantrum," where she continually and belligerently interrupted Officer Burroughs (Burroughs Aff.; Moras Aff.; McGee Statement at 78-79).  Plaintiff's behavior was consistent with someone who had consumed alcohol, and only at that point did Officer Burroughs effect a full custodial arrest of Plaintiff. (Burroughs Aff.).  Officer Burroughs' suspicions that Plaintiff was under the influence of alcohol were further confirmed by the fact she smelled of alcohol during the ride to the police station, a fact which she did not deny.  (Dixon Depo. at 146-48).

This is not a case where Plaintiff's cup was either empty or in a container that assumptively contained a non-alcoholic beverage – Officer Burroughs could see that Plaintiff's cup was the type of cup used exclusively by the Bar for alcoholic beverages and that it had a dark liquor-like substance in it.  *Cf. Snyder v. United States,* 285 F. 1, at 2-3 (1922)(distinguishing "reasonable" suspicion from "mere" suspicion in a prohibition-era case where a person, who was standing on a public street with only the neck of an unambiguous bottle protruding out of his shirt, was approached by an officer who had no probable cause to seize the bottle without more justification for believing it was liquor).  Moreover, Plaintiff was literally "marked" as a minor very conspicuously on the back of her hand which was holding the cup reserved exclusively for serving alcoholic beverages.  Thus,

23

even without considering witness testimony that Officer Burroughs smelled Plaintiff's drink[18] (Burroughs Aff.; Moras Aff.), – which Plaintiff disputes (Dixon Depo. at 90-91) – the court finds that Burroughs' other sensory perceptions were enough for him to reasonably suspect that the beverage was, in fact, alcoholic in nature, and that Plaintiff was a minor.   As the Supreme Court has stated, "[t]he qualified immunity standard 'gives ample room for mistaken judgments.'"  *Hunter v. Bryant*, 502 U.S. 224, 229 (1991)(citation omitted).   Accordingly, Officer Burroughs had arguable probable cause to arrest Plaintiff, and he is entitled to the defense of qualified immunity, and therefore summary judgment, on this claim.[19]

### 3.    Plaintiff's Arguments in Opposition to Summary Judgment

Plaintiff offers no legal basis for the curious arguments outlined in her opposition to summary judgment, which dramatically shift focus from the measure of reasonable suspicion required *for a probable cause arrest* to the quantum of evidence necessary *for a conviction*.  (Doc. # 60).  Plaintiff contends that probable cause was lacking in this case because,  "Officer Burroughs [] did not take the suspected beverage into evidence, and he did not subject that suspected beverage to any sort of quantifiable testing to determine if the contents did in fact contain the statutorily required amount of alcohol." (Doc. # 60, at 13).  Plaintiff does not explain how Burroughs would

---

[18]   As noted earlier, under Alabama law, detection of a beverage as "alcoholic" via the sense of smell is sufficient.  *Wilson*, 113 So. 2d at 359-60.

[19] Because the court finds that no constitutional violation has occurred, it need not reach the secondary inquiry under a qualified immunity analysis of whether the law regarding probable cause clearly established Officer Burroughs' arrest to be a constitutional violation at the time it occurred. The court notes the obvious point, however, that in light of its finding that Plaintiff's arrest was not in violation of her constitutional rights, it could not find that a reasonable officer in the position of Officer Burroughs should have known that Plaintiff's clearly established rights were violated when she was arrested.

have been able to accomplish that testing prior to arresting her, so the court can only assume that her argument relates to preparation of evidence for the prosecution as opposed to ascertaining whether probable cause exists for an arrest.  Plaintiff even criticizes the City for "*seek[ing] to convict* [her] based solely upon the unsubstantiated conclusory opinion of Officer Burroughs" that the beverage she possessed was, in fact, an "alcoholic beverage" that meets the statutory requirement of "at least one-half of one percent (.5%) of alcohol by volume."  (Doc. # 60, at 13) (emphasis added).[20]

Plaintiff's arguments illogically, and quite belatedly, seek to morph her false arrest claim into one for malicious prosecution. It is clear that Plaintiff's new contentions go far beyond a claim of false arrest for lack of probable cause.  As noted earlier, the Eleventh Circuit has made clear that probable cause "does not require convincing proof, and need not reach the [same] standard of conclusiveness and probability as the facts necessary to support a conviction."  *Wood*, 323 F.3d at 878; *see also Pickens v. Hollowell*, 59 F.3d 1203, 1207 (11th Cir. 1995)(finding that two officers "who otherwise had probable cause to arrest [the plaintiff] pursuant to facially valid arrest warrants [ ] did not have a duty to investigate and decide the potential viability of a defense . . . before arresting [the plaintiff]").  "Arguable probable cause does not require an arresting officer to prove every element of a crime or to obtain a confession before making an arrest, which would negate the

---

[20] Although the parties dispute whether or not "one-half of one percent or more of alcohol by volume" is a required element of proof of the MIP law or is merely a "catch-all" or alternate means of proving a beverage to be alcoholic (*compare* Doc. # 57, at 19-20 *with* Doc. # 60), this dispute is not material to the court's analysis of the issues before it in this opinion.  The proof required for a conviction under the MIP law is a matter for the *state court* to determine in the context of Plaintiff's criminal prosecution.  It is not material to the probable cause inquiry.  Indeed, even if Plaintiff's beverage did not meet the statutory definition of "alcoholic beverage" (whatever that may be), it does not follow *a fortiori* that Burroughs lacked arguable probable cause to make an arrest. "Even law enforcement officials who reasonably but mistakenly conclude that probable cause is present are entitled to immunity."  *Wood*, 323 F.3d at 878.

concept of probable cause and transform arresting officers into prosecutors." *Scarbrough v. Myles*, 245 F.3d 1299, 1302-03 (11th Cir. 2001).

But Plaintiff's argument does not stop with complaints about her prosecution.  Plaintiff even goes so far as to suggest that this court has the capacity to govern her criminal court proceeding by instructing the state court as to the quantum of proof *required for a criminal conviction* under the MIP law.  (Doc. # 60, at 12-14).  Essentially, Plaintiff asks this court to mint a new claim altogether based upon what she perceives to be a "malicious conviction."  Aside from the fact that no "malicious conviction" claim, or for that matter *any* cognizable federal claim, arises from the failure to prove a criminal conduct beyond a reasonable doubt,[21] such an invasion of the state court criminal proceeding would offend the fundamentals of federalism.

Moreover, even assuming that Plaintiff now seeks to pursue a garden-variety malicious prosecution claim under § 1983 (a claim which, not insignificantly, was never expressly pled in this case), no such claim has accrued.  At the time Plaintiff filed her Second Amended Complaint, and even by the time Defendants filed their dispositive motions, Plaintiff's state court criminal proceedings had not yet been resolved, much less resolved in her favor.  Pursuant to *Heck v. Humphrey*, 512 U.S. 477 (1994), "[o]ne element that must be alleged and proved in a malicious

---

[21] As the City aptly notes in its reply brief:

> essential to Plaintiff's theory is the mistaken idea that civil liability may attach merely because there might be a failure to prove criminal conduct beyond a reasonable doubt. There is no constitutional provision, statute, or state tort that supports such a theory. Liability based on the quantum of evidence to support an arrest or a prosecution depends on the concepts of "probable cause" or "arguable probable cause," and not whether there will be proof beyond a reasonable doubt.

(Doc. # 62, at 2-3).

prosecution action is termination of the prior criminal proceeding in favor of the accused." *Heck*, 512 U.S. at 484. In other words, to recover damages for harm caused by actions whose unlawfulness would make a conviction or sentence invalid, *i.e.,* malicious prosecution, a plaintiff under § 1983 must prove that the conviction or sentence "has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determinations, or called into question by a federal court's issuance of a writ of habeas corpus." *Heck*, 512 U.S. at 486-87. Thus, Plaintiff's eleventh-hour attempts to convert her false arrest claim to a complaint about her criminal prosecution[22] miss the mark.[23]

## C.    The Claim of Excessive Force Against Officer Burroughs

Plaintiff alleges that Officer Burroughs used excessive force when, during the course of her arrest and detainment at the processing center, he "thr[ew] her against a brick wall, knock[ed] her to the ground in a holding cell and discharg[ed] pepper spray into her face and onto her person." (Doc. # 47, at 5). Plaintiff avers that as a result of those "forceful" encounters, she was "sick, sore

---

[22] The court is not foreclosing the possibility that at least some of Plaintiff's state law claims are actually malicious prosecution claims brought under state common law. But even a state law malicious prosecution claim requires that Plaintiff establish: (1) that a judicial proceeding was initiated by a defendant not only without any probable cause, (2) but also maliciously, and (3) that the judicial proceeding terminated in favor of that plaintiff. *Montgomery v. City of Montgomery*, 732 So.2d 305, 308-09 (Ala. Civ. App. 1999).

[23] Plaintiff's opposition brief also inexplicably resurrects the phrase "due process" by asserting that failure to pharmacologically or chemically test a beverage for alcohol content constitutes a violation of the federal due process clause. (Doc. # 60, at 15) ("To hold [that an agent should not be required to take a suspected beverage into custody and subsequently test it for alcohol content] would be to deny Ms. Dixon her constitutionally protected right to due process as provided by Amendment V and Amendment XIV to the United States Constitution."). Although Plaintiff's March 2007 original complaint mentioned due process, which served as the basis for Defendants' removal to this court, that claim was eliminated from her amended complaints and never mentioned again until now. *(Compare* Doc. # 1-2, at ¶¶ 20-21 *with* Doc. # 47, at ¶¶ 19-20). The court will not consider wholly new claims raised in opposition to summary judgment.

and bruised" (Doc. # 47, at 7-8), when she suffered burning in her eyes and bruising on her arms and hip, all of which were temporary and for which she sought no medical attention (Dixon Depo. at 153-54, 178, 190, 207-09).

Plaintiff's claim is correctly analyzed under the Fourth Amendment to the United States Constitution:  "All claims that law enforcement officers have used excessive force – deadly or not – in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 394 (1989).  Once again, Officer Burroughs has asserted the defense of qualified immunity to this claim.  Thus, the proper analysis is as follows: (1) did Officer Burroughs' use of force constitute a constitutional violation; and (2) if so, was the constitutional right that the defendant violated "clearly established" at the time he did it?  *Crosby*, 394 F.3d at 1332.

### 1.    Officer Burroughs' Use of Force Was Not a Constitutional Violation

As to the first part of the qualified immunity analysis, it is well-settled that the use of *excessive* force violates the Fourth Amendment. *Graham*, 490 U.S. at 394 (clearly establishing that use of excessive force in carrying out arrest constitutes Fourth Amendment violation).  However, it is equally established that an officer's right to effectuate a lawful arrest, regardless of the severity of the offense, "necessarily carries with it the right to use *some degree* of physical coercion or threat thereof to effect it."  *Graham*, 490 U.S. at 396 (emphasis added); *see also Durruthy*, 351 F.3d at 1094 ("This circuit has made clear that some use of force by a police officer when making a custodial arrest is necessary and altogether lawful, regardless of the severity of the alleged offense.").  Indeed, "[i]n the Eleventh Circuit, we recognize that the typical arrest involves some force and injury."  *Rodriguez v. Farrell,* 280 F.3d 1341, 1351 (11th Cir. 2002)(*citing Nolin v. Isbell*, 207 F.3d

28

1253, 1257-58 (11th Cir. 2000)).  Nevertheless, "more force is appropriate for a more serious offense and less force is appropriate for a less serious one." *Lee v. Ferraro*, 284 F.3d 1188, 1198 (11th Cir. 2002).

Thus, the question is one of reasonableness.  To determine whether a plaintiff with an excessive force claim has alleged deprivation of a constitutional right, the key inquiry "is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397.  There is no bright line for identifying force as excessive – "[t]he hazy border between permissible and forbidden force is marked by a multifactored case-by-case balancing test." *Smith v. Maddox,* 127 F.3d 1416, 1419 (11th Cir. 1997).  Moreover, the court must be mindful to judge an officer's acts "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," *Graham*, 490 U.S. at 396, and to allow for the fact that police officers "are often forced to make split-second judgments, in circumstances that are tense, uncertain and rapidly evolving, about amount of force that is necessary in a particular situation," *Graham*, 490 U.S. at 397.

The Eleventh Circuit has set forth several factors to be considered in the analysis "in order to balance the necessity of using some force attendant to an arrest against the arrestee's constitutional rights." *Lee*, 284 F.3d at 1197-98.  To evaluate the relationship between the need for force and the amount of force used, courts should consider: (1) "the severity of the crime at issue;" (2) "whether the suspect poses an immediate threat to the safety of the officers or others;" and (3) "whether [s]he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396 (the "Graham factors"); *see also Lee*, 284 F.3d at 1198 (*citing Leslie v. Ingram*, 786 F.2d 1533, 1536 (11th Cir. 1986), which held that "in determining if force was reasonable, courts must examine (1)

29

the need for the application of force, (2) the relationship between the need and amount of force used, and (3) the extent of the injury inflicted").

Moreover, the principle is well established in this Circuit, "that the application of *de minimis* force, without more, will not support a claim for excessive force in violation of the Fourth Amendment." *Nolin*, 207 F.3d at 1257.[24] "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Saucier,* 533 U.S. at 209 (internal quotation marks omitted). Injuries of a "minor nature . . . reflect[] that minimal force was used." *Gold v. City of Miami*, 121 F.3d 1442, 1446 (11th Cir. 1997).[25]

---

[24] The application of the *de minimis* force principle appears to turn on whether the officer had probable cause or arguable probable cause to arrest the suspect. Indeed, the Eleventh Circuit has held, in cases that involve arrests without probable cause, that the use of *any* force is inappropriate. *See Thornton v. City of Macon*, 132 F.3d 1395, 1400 (11th Cir. 1998)(finding that, without a warrant or probable cause to arrest, police officers were not justified in using any force, which included grabbing the plaintiff on his arms and around his neck, throwing him to the floor, handcuffing him, picking him up by his arms, and dragging him outside to throw him into a police car); *Sheth v. Webster*, 145 F.3d 1231, 1238 (11th Cir. 1998)(holding that an officer without probable cause to arrest the plaintiff was not justified in using any force, including pushing her against a soda machine, handcuffing her, and dragging her to the police car). Those cases do not, however, "foreclose[] a de minimis force principle," such that "a minimal amount of force and injury . . . will not defeat an officer's qualified immunity in an excessive force case." *Nolin*, 207 F.3d at 1257-58 (referring to *Thornton* and *Sheth*). Thus, as the Eleventh Circuit recently clarified, "while the use of force below a *de minimis* threshold ordinarily will not be actionable, . . . even *de minimis* force will violate the Fourth Amendment if the officer is not entitled to arrest or detain the suspect." *Reese v. Herbert*, 527 F.3d 1253, 1272 (11th Cir. 2008)(internal citations and quotations omitted). In this case, the court has already determined that Officer Burroughs had arguable probable cause to arrest Plaintiff, and therefore, the *de minimis* force principle is applicable here.

[25] It should be noted, however, that "[t]he extent of injury is not determinative, because reasonable force does not become excessive merely because it aggravates a pre-existing condition of which the officer was unaware. . . . Conversely, objectively unreasonable force does not become reasonable or *de minimis* merely because the plaintiff only suffered minimal harm." *Lloyd v. Van Tassell*, 2009 WL 179622, at * 2 (11th Cir. 2009)(*citing Lee*, 284 F.3d at 1200).

For the reasons outlined below, the court finds that Officer Burroughs' use of force – which was largely *de minimis* – was proportionate to the circumstances that arose during Plaintiff's arrest for violating the MIP law and, later, for resisting arrest.   The court has methodically reviewed each type of force used by Officer Burroughs in his treatment of Plaintiff and weighed it against the *Graham* factors and other relevant case law.  Based upon that analysis, which follows, the court has determined that none of the forceful tactics employed by Burroughs was violative of the United States Constitution.

### a.        Guiding, Pulling, Pushing

Plaintiff complains that her first forceful interaction with Officer Burroughs was when he grabbed Plaintiff's arm and ushered her out of the Bar onto the sidewalk outside, which she claims left bruises on her arm.  (Burroughs Aff.; McGee Statement at 63-64, 68; Dixon Depo. at 86).  At this point, Plaintiff's alleged crime – violation of the MIP law – was not severe, nor was she posing an immediate threat to the officer or others.   Nevertheless, Officer Burroughs was certainly within his right to pull or guide Plaintiff from the Bar to issue her citation – Plaintiff may not have been actively resisting arrest at that time, but even she admits that she did not leave the Bar voluntarily (Dixon Depo. at 94-97), and she was not handcuffed or otherwise restrained at that time.

In any event, such pulling or guiding is *de minimis* force.   "Not every push or shove" constitutes excessive force.  *Saucier,* 533 U.S. at 209.  Indeed, even a handcuffed suspect (which Plaintiff was not) can be guided, pulled or even pushed without it rising to the level of a constitutional violation.   *See Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1559-60 (11th Cir. 1993), *modified in part*, 14 F.3d 583 (11th Cir. 1994) (noting that although no force was needed on a suspect who was handcuffed and non-resistant, the amount of force used (pushing) was not plainly

unlawful and therefore defendant was entitled to qualified immunity).  As one court aptly noted, "[t]he Constitution does not require that a law enforcement officer use mom's gentle touch or display refined manners when taking someone into custody."  *Mladek v. Day*, 320 F.Supp.2d 1373, 1377 (M.D.Ga., 2004), *aff'd*, 125 Fed. Appx. 978 (11th Cir. 2004).

### b.   Effectuating a Full Custodial Arrest with Handcuffs

Officer Burroughs initially thought that, once they were outside of the Bar, he would simply issue a citation to Plaintiff.  (Burroughs Aff.).  However, while outside, Plaintiff began to throw a "temper tantrum" by continually interrupting Officer Burroughs, denying that she had consumed alcohol, and belligerently denying that Officer Burroughs had the right to charge her with a violation. (Burroughs Aff.; Moras Aff.; McGee Statement at 78-79; Dixon Depo. at 92, 93, 101-02).  When Yerbey inserted himself into the fray, the situation intensified and compounded the threat of violence from inebriated onlookers.  (Dixon Depo. at 97-99, 236; Moras Aff.; Burroughs Aff.; McGee Statement at 75; Yerbey Depo. at 9-16, 108-11).  In light of those quickly escalating and potentially dangerous circumstances, Officer Burroughs decided to effectuate a full custodial arrest and take Plaintiff to the police station for further processing.  (Burroughs Aff.).   Plaintiff disputes his authority to make such a decision.

Evaluation of the *Graham* factors again tips the scale in Officer Burroughs' favor.  Although Plaintiff's offense of violation of the MIP law remained minor in severity and she was not actively resisting arrest, her actions did pose an immediate threat to the safety of Officer Burroughs and others.  It is axiomatic that the midnight arrest of a minor at a Bar during a band party with inebriated onlookers could pose a threat to the safety of the officer, the suspect, and others around the situation. And when the situation is compounded by an angry suspect continually denying her guilt, a

belligerent "friend" who is towering over the officer and shielding the suspect, and a growing crowd, the use of some force – including a custodial arrest with handcuffs – seems almost imperative to prevent the situation from escalating into violence.

But even setting aside those extenuating circumstances and the balance of the *Graham* factors, Officer Burroughs' right to handcuff Plaintiff and take her into custody was well-established in the law of this Circuit.  "When an officer lawfully arrests an individual for the commission of a crime, *no matter how minor the offense*, the officer is entitled under controlling Supreme Court precedent to effectuate a full custodial arrest." *Lee*, 284 F.3d at 1196 (emphasis added).  The court has already determined that Burroughs had arguable probable cause to arrest Plaintiff.   Thus, even assuming that Plaintiff had been fully compliant with him, he was well within his authority – as established both by the law of this Circuit and the policies of the Tuscaloosa Police Department[26] – to handcuff Plaintiff and take her downtown for further processing. *Atwater v. City of Lago Vista*, 532 U.S. 318, 353-54 (2001)(finding no constitutional violation when otherwise compliant motorist was arrested, handcuffed, and taken to jail for failing to wear her seat belt, failing to fasten her children in seat belts, driving without license, and failing to provide proof of insurance and noting that "[t]he arrest and booking were inconvenient and embarrassing to [plaintiff], but not so extraordinary as to violate the Fourth Amendment.").

### c.      Using a Brick Wall to Assist with Handcuffing

Plaintiff also complains that during the handcuffing process, Officer Burroughs spun her around and threw her against a brick wall.  (Dixon Depo. at 99).  According to the law of this

---

[26] Burroughs testified that it was standard operating procedure for Tuscaloosa Police Department officers to handcuff suspects before transporting them in the police vehicle.  (Burroughs Aff.).

Circuit, Officer Burroughs' use of the brick wall to aid in the arrest was nothing more than *de minimis* force. *Jones v. City of Dothan*, 121 F.3d 1456, 1458 (11th Cir. 1997)(finding that officer used *de minimis* force when, without provocation, he slammed a suspect against a wall and kicked his legs apart); *Nolin*, 207 F.3d at 1257-58 (finding that officer used *de minimis* force when he grabbed an arrestee from behind, shoved him a few feet against a vehicle, and pushed him up against a van, which resulted in minor bruising but did not require medical treatment); *Post*, 7 F.3d at 1556 (11th Cir. 1993)(finding that officer used *de minimis* force when he pushed a handcuffed arrestee up against a wall because the arrestee spoke after being told to "shut up").

In any event, the force used by Officer Burroughs to secure Plaintiff in handcuffs comports with the *Graham* factors.  Plaintiff admits that she "flinched" during the handcuffing procedure, which prevented Officer Burroughs from securing one of her wrists.  (Dixon Depo. at 99; Burroughs Aff.; Moras Aff.; McGee Statement at 79-83).  Other witnesses observed Plaintiff resisting arrest (Moras Aff.; McGee Statement at 79-83), and it was reasonable for Officer Burroughs to have interpreted her "flinching" as resistance.  *See Post*, 7 F.3d at 1559-60 (finding that a reasonable officer could have interpreted the suspect's raising of hands as resistance).  Under *Graham*, when Plaintiff began resisting arrest, both the severity of the crimes with which she was charged and the threat she presented to Officer Burroughs and others increased exponentially.  Thus, even if Officer Burroughs' use of the brick wall to aid in securing Plaintiff's handcuffs was not *de minimis*, it was certainly a proportionate response given what appeared to be her resistance.

### d.    Bruising Caused by Handcuffs During Transportation to Station

Plaintiff next complains of bruising caused by her handcuffs while she was sitting in the police car, although it is undisputed that, on the night of the arrest, Plaintiff never voiced any

complaints of pain from her handcuffs, nor did she request that they be loosened. (Dixon Depo. at 145). Nevertheless, even if her handcuffs did cause painful injuries, the use thereof was not excessive force. *See Gold*, 121 F.3d at 1446 (finding that minimal, not excessive, force caused injury to plaintiff where he experienced pain from handcuffs for twenty minutes and skin abrasions for which he did not seek medical treatment); *Davis v. Lowers*, 132 Fed. Appx. 302, 304-06 (11th Cir. 2005)(finding that subjection of an arrestee to "tight and bighting handcuffs" which caused permanent scarring did not constitute use of excessive force, even after officer refused to loosen handcuffs when he saw the arrestee's wrists were bleeding); *Rodriguez*, 280 F.3d at 1351-52 (noting that "the typical arrest involves some force and injury" and that "[p]ainful handcuffing, without more, is not excessive force in cases where the resulting injuries are minimal" in a case where the officer ignored the arrestee's screams of pain during the handcuffing process).

e.      **Pushing onto Cell Bench and Administering Pepper Spray**

Plaintiff's final complaints of excessive force relate to events that occurred in a holding cell at the Police Department. After exiting the police car and upon entry into police headquarters, Plaintiff continued her emphatic denials of guilt, which became even more loud and disruptive when Officer Burroughs told her that he was adding a charge of resisting arrest to the MIP law violation. (Burroughs Aff.; Dixon Depo. at 156-57). Officer Burroughs had already observed that Plaintiff smelled of alcohol, which she did not deny. (Dixon Depo. at 146-48). Therefore, when Plaintiff continued to disregard Officer Burroughs' warnings to calm down, he decided to place her in a

35

holding cell to allow him to complete the booking process, and he guided her there by pushing her shoulders.[27]  (Burroughs Aff.; Dixon Depo. at 149, 158).

When they entered the cell, Officer Burroughs forcefully guided Plaintiff down onto a bench and then screamed "harassment," accusing Plaintiff of harassing him.  (Dixon Depo. at 149, 171-72). According to Officer Burroughs, Plaintiff, who was not handcuffed at that time, had increased her level of resistance as they entered the cell, which forced him to push her through the threshold. (Burroughs Aff.).  According to Plaintiff, when she was pushed down onto the bench, she "hit about half of it and fell to the floor." (Dixon Depo. at 164).  While she was on the floor, Officer Burroughs attempted to regain control by applying pepper spray to her face.  (Dixon Depo. at 163-64, 172-73; Burroughs Aff.).

Although the force employed by Officer Burroughs in the holding cell was the most significant force he used throughout his arrest and detainment of Plaintiff, the court finds that neither the push to the bench nor the application of pepper spray rise to the level of excessive force.  As outlined below, neither type of force was excessive under the *Graham* factors because a reasonable officer could have perceived that Plaintiff's condition (un-handcuffed and smelling of alcohol), her charges (resisting arrest in addition to an alcohol violation), and her actions (vocal, if not physical, resistance and a fall to the floor) posed a threat to Officer Burroughs, who was alone in the station at the time.

With respect to Officer Burroughs' decision to forcefully push Plaintiff onto the bench in the holding cell, it is quite significant that Plaintiff, who had already been identified as smelling of

---

[27] Once again, the fact that Officer Burroughs "pushed" or forcefully guided Plaintiff by her shoulders into the cell does not rise to the level of excessive force.  *See Post*, 7 F.3d at 1559-60.

alcohol, *was not handcuffed or otherwise restrained* when he screamed "harassment" and pushed her down.  At that point, Plaintiff had already been charged with resisting arrest, and the reason why she was being put in a holding cell was because of her increasing resistance and belligerence during Officer Burroughs' attempts to enter her information into the computer.   Even completely discounting Burroughs' implication that Plaintiff was harassing him while he was alone in the processing facility at that time, the quantum of force used to push Plaintiff onto the bench was far less than this Circuit has sustained in other contexts involving unrestrained, unsecured suspects. *See, e.g., Nolin*, 207 F.3d at 1255 (finding force to be *de minimis* where an officer grabbed the plaintiff "from behind by the shoulder and wrist, threw him against a van three or four feet away, kneed him in the back and pushed his head into the side of the van, searched his groin area in an uncomfortable manner, and handcuffed him"); *Jones*, 121 F.3d at 1460 (finding the force used to be minor where officers slammed the plaintiff against a wall, kicked his legs apart, required him to put his arms above his head, and pulled his wallet from his pants pocket).  *Compare Lee*, 284 F.3d at 1191, 1198-99 (finding excessive force where the plaintiff *was already handcuffed* when an officer slammed her head on the car); *Priester v. City of Riviera Beach*, 208 F.3d 919, 927 (11th Cir. 2000) (concluding that the force was excessive where a police officer released an attack dog on the plaintiff while the plaintiff *was already secured* and lying on the ground with a gun pointed at his head) *with Durruthy*, 351 F.3d at 1094-95 (concluding no excessive force where during his arrest for not obeying a police command to clear a street, plaintiff was grabbed from behind, pulled to the ground, pinned with a knee to the back, and flex cuffed).  Given the obvious implication that Plaintiff was harassing Burroughs, and in light of the law of this Circuit, the court finds that forcefully pushing Plaintiff onto the bench was not excessive.

Officer Burroughs' use of pepper spray was likewise justified in this situation. Even assuming, as the court must, that Plaintiff did not *physically attack* Officer Burroughs in the cell,[28] a reasonable officer on the scene could have perceived Plaintiff's fall to the floor as a loss of control of the situation that could pose a threat to his safety, especially given that she was not in handcuffs and he was alone in the facility. Pepper spray is "an especially noninvasive weapon," *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1245 (11th Cir. 2003), that "is of limited intrusiveness [] and [] designed to disable a suspect without causing permanent physical injury," *Vinyard v. Wilson,* 311 F.3d 1340, 1348 (11th Cir. 2002)(internal quotation marks and citations omitted). "Courts have consistently concluded that using pepper spray is reasonable [] where the plaintiff was either resisting arrest or refusing police requests." *Vinyard,* 311 F.3d at 1348. That Officer Burroughs did not first give Plaintiff the opportunity to submit to his control before applying the pepper spray does not render the use thereof a constitutional violation. There is "no constitutional requirement for [an officer] to give advance warning to [a suspect] that pepper spray would be used if [the suspect] did not immediately submit to [the officer's] authority." *McCormick*, 333 F.3d at 1244-45 (finding that officer's surprise use of pepper spray to subdue arrestee, who was armed with a walking stick, was not excessive because he had probable cause to believe that arrestee had committed a violent felony after seeing a victim bleeding profusely from a head wound).

---

[28] According to Officer Burroughs, Plaintiff immediately sprung up from the floor swinging at him. (Burroughs Aff.). Officer Burroughs' recollection is corroborated by Dr. Scott Atkins' notes of Plaintiff's recitation of the incident shortly after it happened: that she "instinctively raised her arm and that it made contact with the cop." (Atkins Depo. at 124-25). At her deposition, however, Plaintiff denied that she made any motion in Officer Burroughs' direction, (Dixon Depo. at 169), and the court will accept her version of the facts as true for the purposes of this opinion.

This Circuit has found the use of pepper spray to be excessive under the Fourth Amendment[29] on only a few occasions, and the Eleventh Circuit's finding in at least one of those cases occurred after the incident in this case. *See, e.g., Reese v. Herbert,* 527 F.3d 1253, 1273-74 (11th Cir. 2008)(finding that the use of pepper spray on handcuffed suspect lying face down on the ground was excessive, especially after four officers had "piled on top of him and began kicking and beating him," because he "was not suspected of having committed a serious crime, did not pose an immediate threat of harm to anyone, and was not actively resisting or evading arrest"); *Vinyard*, 311 F.3d at 1349 (reversing a grant of qualified immunity for an officer who forcibly grabbed and used pepper spray on a female suspect who was secured with handcuffs in the back of a patrol car behind a glass partition and posed no threat of harm to the police officer or to the public). *See also McCormick*, 333 F.3d at 1245 n.15 ("We have discovered only one case in our Circuit involving a claim of excessive force based on the use of pepper spray: *Vinyard* . . . .We have noticed only two additional cases in our Circuit involving the use of pepper spray in the course of an arrest. Neither case involved a claim that the use of pepper spray constituted excessive force . . . . *Pace v. Capobianco*, 283 F.3d 1275 (11th Cir. 2002); *Jones v. Cannon*, 174 F.3d 1271 (11th Cir. 1999)"). *But see Garrett v. Athens-Clarke County, Ga.* 378 F.3d 1274 (11th Cir. 2004)(finding that officers did not use excessive force in the course of an arrest when they sprayed arrestee with pepper spray then, after he was compliant, fettered him by tying his wrists less than 12 inches from his ankles

---

[29] The court has intentionally omitted from this discussion cases evaluating the use of pepper spray by prison guards under either the Eight Amendment or the Fourteenth Amendment, because the analysis of those claims utilizes a different analysis. *See, e.g., Danley v. Allen,* 540 F.3d 1298, 1307 (11th Cir. 2008)(evaluating the use of pepper spray by jailers under the test articulated by *Whitley v. Albers*, 475 U.S. 312, 320-21 (1986)).

because he had engaged police in multi-county chase that did not end until he had crashed twice and had violently resisted police by kicking).

From those cases, it can be deduced that "using pepper spray *is excessive force* in cases where the crime is a minor infraction, the arrestee surrenders, is secured, and is not acting violently, and there is no threat to the officers or anyone else." *Vinyard*, 311 F.3d at 1348 (emphasis added).  But that was not the case here.  Even taking the facts in the light most favorable to her, Plaintiff was unsecured and very vocal with her resistance, which had increased after she was informed of the charge of resisting arrest.   Moreover, given that Burroughs was alone in the facility at the time, a reasonable officer in his position could have concluded that control was lost when Plaintiff fell onto the floor.  Thus, the court finds this case to be distinguishable from the facts in *Reese*[30] or *Vinyard*.

The court cannot – and should not – evaluate whether Officer Burroughs' use of pepper spray was absolutely necessary in this case, because that would be nothing more than an attempt to second-guess his split-second decisions using 20/20 hindsight.  As the Supreme Court has made clear, this is the wrong manner in which to make the inquiry.  *Graham*, 490 U.S. at 396.   Thus, it is not appropriate for the court to determine whether some other type of force would have worked or otherwise been enough to contain the suspect – rather, the court must judge Officer Burroughs' decisions "from the perspective of a reasonable officer on the scene." *Graham*, 490 U.S. at 396. This court will not play judicial Monday morning quarterback regarding Officer Burroughs' decision to use force, including pepper spray, to regain control of a unsecured arrestee.

_____

[30] Even if it could be argued that Officer Burroughs' use of pepper spray was excessive under *Reese,* that case had not been decided at the time of the incident in this case and could not have "clearly established" the law.

40

For this, and all of the other reasons outlined above, the court finds that Officer Burroughs' use of force was not excessive in this case and does not constitute a constitutional violation.[31] Accordingly, Officer Burroughs is due qualified immunity on Plaintiff's excessive force allegations, and summary judgment is appropriate on this claim for this reason alone. Nevertheless, the court has alternatively considered whether, if some or all of the types of force used by Officer Burroughs rise to the level of a constitutional violation, an officer in his position would or should have had notice, on September 6, 2006, that his actions were violative of the United States Constitution.

### 2. Alternatively, Officer Burroughs' Conduct Was Not "Clearly Established" as a Constitutional Violation When Plaintiff Was Arrested

Having considered in the alternative the second part of the qualified immunity analysis, the court finds that even if Plaintiff had made a sufficient showing of excessive force (which she has not), Officer Burroughs would nonetheless be entitled to qualified immunity on the ground that the law had not clearly established at the time of the incident that such force was excessive. The Eleventh Circuit has established the standard:

> There are two ways for a party to show that the law clearly established that a particular amount of force was excessive. The first is to point to a "materially similar case [that has] already decided that what the police officer was doing was unlawful."

---

[31] Although the court has carefully considered, and rejected, each individual instance of alleged excessive force, it can also generally be said that the nature of Plaintiff's injuries - most of which can only be characterized as *de minimis* – further undermine her claim. As noted earlier, injuries of a "minor nature . . . reflect[] that minimal force was used." *Gold*, 121 F.3d at 1446. Although Plaintiff's arm and hip were bruised, she suffered no scrapes, cuts, blisters, or blood. (Dixon Depo. at 153). She never sought medical attention for any of her injuries, (Dixon Depo. at 153-54, 178, 207-09), which all resolved within the next week or so (Dixon Depo. at 190). Indeed, Plaintiff's injuries were so minor that after her release from the Metro Jail, she returned to classes the following day. (Dixon Depo. at 206). Although "[t]he extent of [Plaintiff's] injur[ies] is not determinative," *Lloyd*, 2009 WL 179622, at * 2, the minimal nature of Plaintiff's injuries provides additional support for the court's independent determination that, on each occasion, the force used was reasonable.

> [*Willingham v. Loughnan*, 261 F.3d 1178, 1187 (11th Cir. 2001)]. Because identifying factually similar cases may be difficult in the excessive force context, we have recognized a narrow exception also allowing parties to show "that the official's conduct lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of case law." *Priester*, 208 F.3d at 926 (*quoting Smith v. Mattox*, 127 F.3d 1416, 1419 (11th Cir. 1997)). Under this test, the law is clearly established, and qualified immunity can be overcome, only if the standards set forth in *Graham* and our own case law "inevitably lead every reasonable officer in [the defendant's] position to conclude the force was unlawful." *Id.* (*quoting Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1559 (11th Cir. 1993)).

*Lee*, 284 F.3d at 1198-99.   Neither of these situations is applicable here.

As to the first method, as outlined above in Section III.C.2, *supra*, the court has not identified a "materially similar case [that had] already decided that what [Officer Burroughs] was doing was unlawful" at the time of his actions. *Willingham*, 261 F.3d at 1187. With respect to the second method, which is only a "narrow exception," the court finds that Officer Burroughs' use of force was not so grossly disproportionate to the circumstances that no reasonable officer could have believed his actions were lawful.  *Cf. Lee*, 284 F.3d at 1199 (finding that even though officer "undoubtedly possessed the lawful power to effect a custodial arrest and secure [plaintiff] with handcuffs, a reasonable officer could not possibly have believed that he then had the lawful authority to take her to the back of her car and slam her head against the trunk after she was arrested, handcuffed, and completely secured, and after any danger to the arresting officer, as well as any risk of flight had passed.").  The conduct of Officer Burroughs, outlined in detail earlier, is not the type of conduct that goes "so far beyond the hazy border between excessive and acceptable force that [Officer Burroughs knew that he was] violating the Constitution." *Priester*, 208 F.3d at 926-27 (internal quotation marks omitted). Thus, for this alternative reason, Officer Burroughs is due the protection of qualified immunity, and summary judgment on Plaintiff's excessive force claim is appropriate.

As a final note, the court – again – would be remiss to ignore the sharp deviation of Plaintiff's opposition brief from the excessive force claim pled in her Second Amended Complaint. Indeed, Plaintiff punts altogether on her contention that *Officer Burroughs* used excessive force, claiming instead that *she* was justified in using "reasonable force to resist an unlawful arrest." (Doc. # 60, at 15-16). While that argument may be relevant in her criminal proceeding as a defense to her "resisting arrest" charge, the only purpose it serves in this case is to give additional justification to Officer Burroughs' use of force to regain control over Plaintiff. If, as Plaintiff now appears to admit, she did use some physical force against Officer Burroughs to resist his efforts to arrest her (as Officer Burroughs has maintained all along), the balance of the *Graham* factors weighs even more heavily in his favor.

Moreover, Plaintiff's abandonment of her excessive force claim is an additional, independent reason for granting summary judgment on this claim against Officer Burroughs. "[G]rounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned." *Edmondson v. Board of Trustees of University of Alabama,* 258 Fed.Appx. 250, 253 (11th Cir. 2007)(*citing Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995))("In opposing a motion for summary judgment, a party may not rely on her pleadings to avoid judgment against her. There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment. Rather, the onus is upon the parties to formulate arguments . . . . Here, [plaintiff] did not respond to [defendant's] motion for summary judgment on the Equal Protection Act claim. Therefore, she has abandoned it."); *see also Brewer v. Purvis*, 816 F. Supp. 1560, 1579 (M.D. Ga. 1993), *aff'd,* 44 F.3d 1008 (11th Cir. 1995)("Summary Judgment is appropriate since plaintiff failed to respond to [defendant's] argument on this issue.")(citations

omitted).   For all of these reasons, Plaintiff's excessive force claim cannot survive Officer

Burroughs' motion for summary judgment.

## IV.    Claims Against the City

The court's analysis of Plaintiff's federal claims against Officer Burroughs, the person who

committed the acts of which she complains, differs greatly from its analysis of the same claims

against the City, the municipality that employed the actor.  In order to prevail in a § 1983 action, a

plaintiff must show a deprivation of a federal right by a person acting under color of state law.

*Griffin v. City of Opa-Locka*, 261 F.3d 1295, 1303 (11th Cir. 2001). Municipalities and other local

government entities are included among those persons to whom § 1983 applies, *Monell v.*

*Department of Social Services*, 436 U.S. 658, 690-91 (1978), but may not be held liable on a

*respondeat superior* theory, *Board of County Commissioners v. Brown*, 520 U.S. 397, 403 (1997).

Therefore, a § 1983 claim can lie against the City only if Plaintiff has shown that "the

[alleged] constitutional deprivation resulted from a custom, policy, or practice of the municipality."

*Wideman v. Shallowford Comm. Hosp., Inc.*, 826 F.2d 1030, 1032 (11th Cir. 1987)(citing *Monell*,

436 U.S. at 691).  To accomplish this, Plaintiff must establish: (1) that her constitutional rights were

violated; (2) that the City had a policy or custom that constituted deliberate indifference to that

constitutional right; and (3) that the policy or custom caused the violation. *McDowell v. Brown*, 392

F.3d 1283, 1289 (11th Cir. 2004). "A policy is a decision that is officially adopted by the

municipality, or created by an official of such rank that he or she could be said to be acting on behalf

of the municipality." *Sewell v. Town of Lake Hamilton*, 117 F.3d 488, 489 (11th Cir. 1997).  A

custom is a practice that is so settled and permanent that it takes on the force of law.  *Monell,* 436

U.S. at 691.  To establish the liability of a municipality based on a custom, "it is generally necessary

44

to show a persistent and widespread practice.  Moreover, actual or constructive knowledge of such customs must be attributed to . . . the municipality. Normally, random acts or isolated incidents are insufficient." *Church v. City of Huntsville*, 30 F.3d 1332, 1345 (11th Cir. 1994)(citation omitted).

The Supreme Court has also made clear that "the inadequacy of police training may serve as a basis for § 1983 liability." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). However, such liability attaches "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Harris*, 489 U.S. at 388. "This C[ircuit] similarly has recognized that a municipality is liable under § 1983 if the plaintiff's injury was caused by a 'pattern of improper training' of police officers, of which the municipality was aware and deliberately indifferent." *Wakefield v. City of Pembroke Pines*, 269 Fed.Appx. 936, 940 (11th Cir. 2008)(*quoting Mercado v. City of Orlando*, 407 F.3d 1152, 1161 (11th Cir. 2005)).

Here, the court need not analyze whether any municipal policy, practice, or custom led to the alleged constitutional violations,[32] because the court has already found that no constitutional violation occurred in the first instance.  The City cannot be liable if Officer Burroughs is not liable. As the court has already determined that Officer Burroughs' "arrest and use of force were constitutionally permissible, [] there can be no policy or custom of the City that 'officially sanctioned or ordered' a constitutional violation." *McCormick*, 33 F.3d at 1243 (*citing Brown v. City of Clewiston*, 848 F.2d 1534, 1538 (11th Cir. 1988)).  In such a situation, the municipality's policies are "quite beside the point." *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)(finding that if

---

[32] In any event, the court finds no evidence regarding the existence, much less content, of any City customs, policies, or practices with regard to the existence of probable cause for an arrest or the use of force that were the "moving force" of the alleged constitutional violations. *Monell*, 436 U.S. at 694-95.

the plaintiff has suffered no constitutional injury at the hands of the individual police officer upon whose conduct the claim is predicated, then there is no municipal liability).  For this reason, summary judgment in favor of the City is appropriate.

## V.    Conclusion

Both Officer Burroughs and the City have carried their burdens on summary judgment of demonstrating that there are no material facts in dispute and that they are entitled to judgment as a matter of law on Plaintiff's Fourth Amendment claims under §1983 for false arrest and excessive force, which were the only federal claims pled in this case and the only basis for federal jurisdiction upon removal of the case to this court.  The remaining claims in this case were all brought pursuant to state law and removed to this court pursuant to the court's supplemental jurisdiction under § 1367.

"At this time, the case retains no independent basis for federal jurisdiction and the only claims that remain deal with complex questions of discretionary function immunity in the state of Alabama. A proper resolution of the [] state law causes of action will require a careful analysis of Alabama law – something the courts of Alabama are in the best position to undertake and, for reasons of federalism, should undertake in this sensitive area. [Accordingly, the court] conclude[s] that [it] should dismiss the state law claims so that [Plaintiff] may pursue them in state court." *Nolin* 207 F.3d at 1258 (finding that, after grant of summary judgment on § 1983 false arrest and excessive force claims, plaintiff's state law claims of assault and battery and false imprisonment should be relegated to the state courts for disposition).

Thus, the court, in its discretion pursuant to 28 U.S.C. § 1367(c)(3), declines to exercise supplemental jurisdiction over the remaining state law claims, and accordingly, those claims are due to be remanded to the court from whence they came.  A separate order will be entered.

**DONE** and **ORDERED** this _____17th_____ day of February, 2009.

_____
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE